```
1              IN THE UNITED STATES DISTRICT COURT
                       DISTRICT OF KANSAS
2

3  THE UNITED STATES OF AMERICA,

4              Plaintiff,

5       vs.                         District Court
                                    Case Number
6  LAQUAVION M. BENTLEY,            23-10012-JWB
               Defendant.
7

8

                     TRANSCRIPT OF PROCEEDINGS
9

10       On the 10th day of April, 2023 at 9:10 a.m. came
   on to be heard in the DETENTION HEARING in the
11 above-entitled and numbered cause before the HONORABLE
   JOHN W. BROOMES, Judge of the United States District
12 Court for the District of Kansas, Sitting in Wichita.
           Proceedings recorded by mechanical stenography.
13         Transcript produced by computer.

14

15 APPEARANCES

16         The Plaintiff appeared by and through:
           Mr. Matt Treaster
17         United States Attorney's Office
           301 N. Main, Suite 1200
18         Wichita, Kansas 67202

19         The Defendant appeared in person, by and through:
           Ms. Jennifer Amyx
20         Federal Public Defender's Office
           301 N. Main, Suite 850
21         Wichita, KS 67202

22

23

24

25
```

1          (The following proceedings commenced at 9:10 a.m.

2    and were requested transcribed:)

3          THE COURT:  We're here on Case Number 23-10012,

4    United States versus Laquavion M. Bentley.

5          May I have appearances, please.

6          MR. TREASTER:  Good morning, Your Honor.

7          The United States appears by Matt Treaster,

8    Assistant United States Attorney.

9          MS. AMYX:  Good morning, Your Honor.

10         Jennifer Amyx appears for Laquavion Bentley, who

11   appears in person, and in custody.

12         THE COURT:  Mr. Bentley, can you understand

13   everything being said in the courtroom today?

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT:  All right.  We're here on a motion

16   for review of detention order filed by the defendant at

17   Docket Entry 13 in this case.  It appears that the

18   magistrate judge ordered detention and the defendant is

19   seeking review of that under 18 U.S. Code 3145 so that's

20   what brings us here.

21         You ready to start?

22         Mr. Treaster?

23         MR. TREASTER:  Yes, Your Honor.

24         THE COURT:  Let's go ahead and get to it.

25         MR. TREASTER:  Your Honor, we are asking for

1 detention under 18 U.S. Code 3142(f)(1)(E), that is the

2 defendant is charged with a crime involving a firearm.

3        What led us to this, at least to the federal

4 involvement, was a shooting that this defendant was

5 involved in where he shot and killed a gentleman by the

6 name of Devin Bills.  It sounds like from what I've read,

7 and I haven't focussed on the homicide situation because

8 that's not what my case deals with, but there were

9 several young men who all had firearms that evening.

10 Mr. Bills was one of those, and the defendant and him

11 were quarreling of some sort and the defendant ended up

12 shooting Mr. Bills in the chest and he died.

13        THE COURT:  Where's that reflected in the bond

14 report?

15        I saw several cases in there as I reviewed this so

16 I want to note specifically which one we're talking about

17 there and what the status of that is.

18        MR. TREASTER:  I believe it's at the bottom of

19 page 8 where he was charged with criminal possession of a

20 weapon by a felon, and criminal threat.

21        I think that's right.  No -- yeah, yeah, that

22 would be right.

23        It says on the top of page 9 the defendant was

24 also arrested for second degree murder but the prosecutor

25 declined to prosecute that charge so they left the other

1  charges in place.

2          THE COURT:  So --

3          MR. TREASTER:  I believe there was a "stand your

4  ground" question, Your Honor, involved.

5          THE COURT:  Okay.  So it's your position that

6  factually this defendant shot and killed another person

7  in the events underlying that case, but the state

8  prosecutors declined prosecution on that and is

9  proceeding on these other charges; is that right?

10         MR. TREASTER:  Yes, Your Honor.

11         THE COURT:  Okay.

12         MR. TREASTER:  And so it was on the evening of

13 that shooting that led them to Mr. Bentley's bedroom

14 where they found the silencer.  And so as you look

15 through the factors under 3142(g), the first factor,

16 defense does involve a firearm, as a silencer is defined

17 as a firearm under federal law.

18         Number two, we believe the weight of the evidence

19 is strong; it was found if the defendant's bedroom

20 dresser next to his student ID.

21         There was also a video on one of his cell phones

22 that I have a still from that I would like to present to

23 the Court.

24         It shows the defendant holding a red and black

25 firearm with a cylindrical silencer on the end of it.

1  And this was taken -- we believe the video was shot

2  December 28 of 2021.

3          And I have already provided this to defense

4  counsel.  If I may approach?

5          THE COURT:  Yes.  I would like to know -- he's

6  charged here in -- it's a tax count, failure to

7  register --

8          MR. TREASTER:  Yes, sir.

9          THE COURT:  -- and obtain a stamp.

10      Why isn't he charged under 922 -- 18 U.S. Code 922

11  if he is legally barred from possessing this, because it

12  is defined as a firearm and he's otherwise an illegal

13  person?

14          MR. TREASTER:  Your Honor, off the cuff, my

15  recollection is that under Tenth Circuit law we can't use

16  that part of the statute so we used the tax part of the

17  statute.

18          THE COURT:  Can't use what part of the statute?

19          MR. TREASTER:  What he is charged with now.

20          MS. AMYX:  What?

21          THE COURT:  Why is that?

22          MR. TREASTER:  As I said, Your Honor, I believe

23  there's a Tenth Circuit case, and I -- I haven't looked

24  at it for a long time, I just know that when I have these

25  cases I go to the tax part of it, which is where he is

1   charged at.

2           THE COURT:  Well, part of what?

3         This is not even in the same title, this is a tax

4   statute.

5         It doesn't make it illegal to have this gun, only

6   illegal if you haven't paid the tax on it.  Or, excuse

7   me, the suppressor.  So that's what I am kind of getting

8   at here is the -- as I'm thinking about this the -- what

9   do you call it?

10         The word I'm looking for here the wording eludes

11   me, but there's an inherent kind of criminality or --

12   evil is the wrong word, but it's that concept that

13   attaches more in my sense to when you are a prohibited

14   person not allowed to have a weapon because of your prior

15   bad conduct versus a tax statute where you could have

16   this except you didn't pay the taxes on it.

17         I mean it's a law no doubt, but there is a

18   difference in quality there that I'm just trying to kick

19   them around in my head, I haven't had to deal with this

20   before, but that is why I am asking that question.

21           MR. TREASTER:  Right.  I understand, Your Honor,

22   and there I believe is a Tenth Circuit law or case on

23   this that we don't use the 922 area, we use the tax law.

24         Now something interesting about this silencer,

25   Your Honor, it has no markings and serial number on it at

1  all.  So even if you could, you couldn't register this.

2  It is illegal in itself because it's -- you can't

3  register it, it is an impossibility.  You would have to

4  have the markings put on it, and in the shape that he had

5  it in there's no markings at all on the silencer.

6         THE COURT:  Well, does that mean that since it

7  can't be registered it's not covered by the statute?

8         MR. TREASTER:  No, it is covered by the statute.

9         THE COURT:  Well, how can it be covered by the

10  statute?

11         MR. TREASTER:  Because you can't register.

12         THE COURT:  How can it be covered under the

13  statute that says you have to register it if you can't

14  register it?

15         MR. TREASTER:  That is a later charge.

16      No, it's just like a gun.  It has to have the

17  serial numbers on it.  So he could not lawfully register

18  it.  There is just no mechanism because he would have to

19  get a serial number put on it.

20         THE COURT:  Okay.

21         MR. TREASTER:  So we have the defendant here

22  with a silencer back in December of 2021.

23      The history of the defendant, the defendant does

24  have ties to the community, we acknowledge that.  He has

25  lived here his entire life.

1        But he does have a past of conduct, especially

2   with firearms, that concerns the Government.  The

3   defendant, who is only 19, has a history of committing

4   crimes with firearms.

5        His very first conviction was as a juvenile for

6   felony theft of a firearm.  He was adjudicated of

7   criminal use of a weapon in 2020, and then he was

8   adjudicated of criminal possession of a firearm, also in

9   2020.

10        He has picked up now several new cases, and I know

11   they're just charges but there is certainly a pattern

12   here.  New cases in state court in 2022, and those are

13   outlined in the pretrial services report, and they all

14   involved him illegally possessing a firearm.  He also

15   picked up the current federal case, following the first

16   of these cases, then each time he was on bond -- so each

17   time he has accumulated new cases while he has been on

18   bond.

19        He has a history, if you look at the pretrial

20   services report, of not following the Court's

21   instructions.  He has had several failures to appear.  He

22   has also had several probation violations over the last

23   five years.

24        I think the best synopsis of his accumulation of

25   the cases is on page 8 in the pretrial services report.

1  In the middle there, the third sentence it says,

2  "However, as noted in his criminal history and confirmed

3  by pretrial services officer, the defendant has

4  repeatedly been arrested for new law violations while on

5  bond."

6        Specifically she noted the following:  "His bond

7  was revoked on September 13th, 2022 for a new arrest for

8  DUI and driving while suspended.  He bonded out again on

9  November 3rd, 2022, and was placed back on supervision

10  and location monitoring.

11        His bond was again revoked for a new arrest

12  occurring on January 15th, 2023 for possession of a

13  firearm and possession of a controlled substance.  The

14  warrant was quashed at his first appearance with no

15  charges filed and he was released.

16        He was again arrested on January 24th, 2023 for

17  two counts of aggravated assault and discharging a

18  firearm.  His bond is revoked and he bonds out again on

19  February 10th, 2003.

20        He has remained on bond until the marshals

21  arrested him on the federal charge on February 28th,

22  2023."

23        As noted above, the defendant has been on location

24  monitoring since November but has continued to have new

25  law violations.  Based on these factors, we believe there

1 is a danger to the community.

2       We understand the defendant has strong familial

3 support.  I don't think, though, that he would harm

4 anyone in his own family but I am concerned about the

5 safety of the public in general and, in particular, the

6 supervising probation officers of this Court because he

7 has a propensity to possess firearms.

8       The defendant has been on strict bond with ankle

9 monitoring but he has been able to accumulate more cases.

10 And one of the best predictors of future action is when

11 we look at someone's past actions, especially in the

12 recent past.

13       We understand his plan is to go live with his

14 mother.  This is who he has lived with during most of the

15 time that he has accumulated his cases.  This is where

16 the silencer was found.  We do not believe this is a good

17 location because it does not appear to be a positive

18 place for him.

19       The alternative now is his aunt's location.  I'll

20 point out to the Court that that is where he ultimately

21 fled on the night that he killed the other man.  It is

22 also where he was at when he accumulated some of these

23 most recent charges.

24       I would point out even though, like his aunt said,

25 there is no firearms at his house, there is still a

1 firearm out there.  The firearm that he used to kill

2 Mr. Bills with we have never found and he's never turned

3 it in so it would be likely that he is a person that

4 would have access to that stray firearm, wherever that is

5 at.

6         The Government does not believe there is a set of

7 conditions that this Court can set that will adequately

8 protect the community, and we believe he's a danger and

9 should be detained pending further hearings in this

10 matter.

11         Thank you, Your Honor.

12          THE COURT:  Thank you.

13         Ms. Amyx.

14          MS. AMYX:  Thank you, Your Honor.

15         May it please the Court.

16         Your Honor, I am going to begin by trying to

17 answer some of the Court's questions and fill in some of

18 these gaps.  To be clear, I don't think that this Court

19 is going to carry water for a state prosecution or for

20 circumstances that upset people at the state level so

21 they decide, well, we need to pursue a federal case so we

22 can keep this kid in custody.

23         That's what is going on here.  Here is why I think

24 that.

25         My client was released from custody on his most

1  recent case on 2-10 of '23.  He was then indicted 12 days

2  later on 2-22 for the federal suppressor or silencer

3  case.  The basis for this is that the officers were,

4  frankly, upset about his getting out on bond on these

5  cases and what the charging decisions were.  I'm going to

6  go back through why I think that is true and why that

7  this is vindictive at this level.

8       I'm going to point the Court to the State of

9  Kansas immunity statute which says that my client is

10 immune not just from arrest and prosecution, but this

11 investigative stage where they try to go through his life

12 to try to show this.  The chronological order with which

13 they did that, we also believe, violates criminal

14 procedure.

15      He was in custody at the time that the officers

16 are searching his mom's home in an effort to locate him.

17 When they get to his mom's basement, they decide they're

18 going to look under the bed to try to locate him.  It

19 doesn't appear to me that a person could fit underneath

20 the bed and on the basis -- well, I'll read from the

21 warrant in a minute.

22      I'm going to show you some photos, but we're going

23 to start at the beginning, Judge, and that's with the

24 law, and then we'll go through the factors under the Bail

25 Reform Act and the specific four pending cases, why there

1 is not a firearm associated with each of those cases, and

2 I would be happy to provide you more information about

3 anything you want as we go along.

4     So beginning with the law, the Bail Reform Act

5 under 18 U.S.C. 3142 sets out a number of factors, if the

6 Court gets there.  But even before we turn our attention

7 to the statute I would point the Court to *Salerno*, the

8 Supreme Court case which interpreted this statute and

9 made it very clear that detention is supposed to be the

10 exception, and release is supposed to be the rule, and if

11 we're concerned at all about the community safety, then

12 release on conditions is supposed to be the rule.  Not

13 the exception.

14     *Salerno* governs this case, in addition to the

15 factors from 3142.  Under 3142 the presumption again is

16 release, and if the Court finds under Subsection (b) that

17 the pretrial release of a person has the potential to

18 endanger anybody in the community, then the Court has the

19 option of setting conditions.

20     I will conclude my presentation today with the

21 conditions that we are asking for, and they are

22 extensive, Your Honor.  But before we lock someone up who

23 has been accused of crimes but not convicted of them,

24 certainly at his age and with the permanent trauma that

25 that can cause, I would ask the Court to apply the law

1  and to release him to pretrial services.

2         Now, turning to the bond statute, the nature and

3  circumstances of the charge.  The prosecutor and Court

4  had a brief conversation with this but it is one of the

5  three big factors.

6         So, the nature of this charge is a status offense

7  for a paperwork offense.  That means that an individual

8  did not register a piece of equipment with the federal

9  government.  Your Honor, this particular ATF regulation

10 has not been challenged under *Bruin* yet.  However, there

11 are -- there is substantial litigation pending regarding

12 this issue.

13        I point the Court to the Texas lawsuit by the

14 Attorney General challenging this, as well as the State

15 of Kansas law which has also gone up.  In both instances

16 both states have ruled and say, If you make silencer or a

17 suppressor within the state of Kansas, so it's not

18 crossing borders, and it remains within the state, then

19 you shouldn't be required to put a serial number on it

20 and register it.

21        This goes even a step further because if it is an

22 infringement on a Second Amendment right for a firearm

23 accessory, then in addition to, the ATF will take months,

24 sometimes up to a year to even determine that.  You have

25 to pay money to register it, there is the paperwork

1  process.

2       Under *Bruin* we're not supposed to be infringing

3  Second Amendment rights under the balancing test any

4  more.  It is simply a matter of is this an infringement?

5  And in this case the Courts haven't made the

6  determination yet.  But is a silencer a firearm

7  accessory?

8       The Government wants to have its cake and eat it,

9  too.  They want you to believe it's dangerous, it's a

10 gun, for the nature and circumstances of the charging.

11 But for purposes of applying our Second Amendment rights

12 then, the Government says, Oh, it doesn't count because

13 it's an accessory, it's not a firearm, so the Second

14 Amendment doesn't apply to it.  The Government should not

15 get to have its cake and eat it, too, when it comes to

16 charging and detention of individuals charged with crimes

17 which may not even be crimes.

18       That litigation will be pending and certainly

19 there will be much more litigation in this case moving

20 forward but since we're just at the beginning, Your

21 Honor, I think there is a lot that the Court then needs

22 to know even beyond the nature of the charge in this

23 particular case.

24       I would end my comments regarding this first

25 section by also informing the Court that none of the

1 conduct which is alleged to have taken place under the

2 criminal history section involved a silencer or a

3 suppressor.  So there's no relevant conduct tie, there is

4 no factual or legal tie to the plastic item that they

5 find, or the metal cylinder with plastic inside with no

6 markings on it in this dresser drawer of a basement of a

7 home.  There is no indication that that item was ever

8 used in any crime.

9      Turning then to the weight of the evidence versus

10 the presumption of innocence, certainly the presumption

11 of innocence is always maintained.  The Government offers

12 you a picture from some time ago, again, taken from a

13 phone in a room.  We'll be challenging the search but

14 aside from that there is no indication, again, of a

15 specific crime that is taking place here or with this

16 particular item.  They don't know if it is a real gun or

17 a prop gun.  To be clear, my client is a rapper, he has

18 rap videos, and part of that includes prop work.

19      Now we're going to turn to where I think the Court

20 is really, frankly, interested, and that is going to be

21 on the character basis and those number of factors that

22 are then put there.  And I'm going to spend a substantial

23 amount of time talking about the charged cases.

24      My client is fighting these cases, Your Honor, and

25 with good cause.  I have contacted his state lawyer.  I

1  have received the state discovery in each of these four

2  cases, so as I talk about the cases, Your Honor, that is

3  the basis of my knowledge from them.  I am not winging

4  this or simply repeating what I was told from someone

5  else.  These are facts that I have read in reports and in

6  case discovery regarding this case and, specifically,

7  regarding the shooting that the Government did not

8  provide all the context for.

9        So beginning with the criminal history, and then

10  we'll go through the character items, the most aged

11  pending case is from April of 2022.  In this case

12  officers see a vehicle driving, they suspect that

13  Mr. Bentley is the driver.  Mr. Bentley at the time had a

14  suspended license.  They turn around and follow the car.

15        Car is parked at a Dollar General parking lot.

16  Officers pull up behind the vehicle.  Mr. Bentley gets

17  out, makes contact with them.  There was also other

18  individuals who had gone into the store that were from

19  the car.  Mr. Bentley is then taken into custody.

20        During that time there is still a person inside

21  the car and another person from the vehicle who either

22  left or was in the store.  But Mr. Bentley is out of the

23  car for a substantial period of time being arrested and

24  taken back to the police officer's car, where he is put

25  into cuffs and custody.

1       Subsequent to that they end up searching the

2  vehicle without a warrant and they locate a firearm

3  wrapped in a towel.  It is in the center of the vehicle,

4  so it could have been placed there by any person located

5  within the vehicle.  I don't have any information about

6  any DNA or fingerprints.  There was also marijuana

7  paraphernalia in the car.

8       My client, in speaking with police, told them,

9  Everything related to the marijuana is mine.  The

10 grinder, any bag, any papers, anything like that, it's

11 mine.  But I don't know anything about a gun, and I

12 didn't bring a gun into that car.  Other people had

13 access and may have left it in there.  That is the extent

14 of that case.

15      Now it started as a felon in possession, and then

16 they ended up charging the battery of a law enforcement

17 officer.  The officer testified at the preliminary

18 hearing that his injury was he cut his skin when he was

19 handcuffing my client, and he pinched his skin in the

20 handcuffs, and so he had a bleeding situation, which was

21 treated with a Band-Aid.

22      He was not taken to a hospital.  He did not

23 receive medical care.  There was not what I would frankly

24 term a battery in this case, and certainly not a battery

25 by my client.  Again, he has the right to fight this

1  case.  It is an allegation against him and nothing more.

2        Then we turn to what took place in June.  In June,

3  now this case was currently listed as a aggravated

4  robbery and aggravated -- I'm sorry, aggravated battery,

5  aggravated robbery case.  It was initially a theft case

6  with an aggravated battery and, again, those charges were

7  elevated at the preliminary hearing because my client was

8  fighting the charge.

9        The allegation in this case is that two men, one

10 of them being Mr. Bentley, were engaged with another man

11 at the other man's residence, and a folding chair was

12 used on the back of the head, which caused an aggravated

13 battery.  They also say that the robbery is the basis of

14 the set of car keys that were taken.

15        What the police did not investigate was the

16 backstory between these individuals.  Mr. Bentley and the

17 alleged victim in the case had been corresponding for a

18 period of months.  Mr. Bentley was paying this man to fix

19 his car.  That's why this man had Mr. Bentley's keys.

20 When Mr. -- when the man threw the keys at Mr. Bentley,

21 he took them.

22        This is a dispute about money for the car.

23 Mr. Bentley says he paid the man a lot of money.  The man

24 refused to fix the car, kept asking for more money, more

25 money, more money.  The individual in that case had

1  recently been released from prison for some extensive

2  person felonies and was, according to the neighbors,

3  known to be a user of crack cocaine.  So there is

4  substantial credibility issues in that case.

5        Specifically, even with the injury to this

6  individual, he said that a bump on the back of his head

7  was a result of the folding chair being used on him.  We

8  have a picture of him having that bump, which looks like

9  a standard head cyst, that preexists the date of these

10  events.  So, once again, I think we have a situation

11  where there is very little in the way of corroborating

12  evidence.  We have an allegation.  We have multiple

13  people trying to protect themselves.  And, once again, my

14  client has a right to defend himself against allegations

15  in the community.  A pending case is not the same as a

16  conviction.

17        And I would further note, no firearm.  There is no

18  allegation of a gun, there's no allegation of a shooting.

19  The Government got up here and said, "All these cases

20  involve guns."

21        MR. TREASTER:  I object, Your Honor, I did not.

22  I said several of the cases, I did not say all of them.

23        MS. AMYX:  My recollection is he said all the

24  pending cases involve guns.  If the Government backs off

25  that statement, fantastic.  But regarding the June case,

1 there is no firearm in that case.  The allegation of the

2 weapon is a folding chair.

3        Now we turn to the September event.  And, Judge,

4 this is tragic.  It's something that everyone connected

5 to this and everybody who loves these young men involved

6 is forever going to be devastated by, because like most

7 tragedies, it didn't have to happen.  But that doesn't

8 mean that somebody was at fault or that there was a crime

9 that was committed.

10        Mr. Bentley and a number of his friends were

11 together, drinking, having fun, as young people tend to

12 do.  As the evening wore on and the effects of the

13 substances that were being consumed started to take their

14 effect, Mr. Bentley and one of his best friends, somebody

15 he has known his entire life, he gets mad at Mr. Bentley,

16 and so initially there's just yelling, and it seems to

17 have dissipated but then his friend pulled a firearm and

18 pointed it at him.

19        Attempting to downplay the situation or deescalate

20 it for the next couple of minutes is what the witnesses

21 talk about, but during that time period there for about

22 two minutes, this individual is pointing the gun at

23 Mr. Bentley and everybody's trying to get the situation

24 calmed down.  Mr. Bentley fires a warning shot into the

25 air.

1        Now under the Kansas state immunity statute, that

2   is blessed conduct.  We would much rather people try to

3   scare someone off with a warning shot, letting them know

4   I'm capable of defending myself, we can end this right

5   now.

6        In response to the warning shot being fired in the

7   air, Mr. Bentley's friend fired four shots at him.  He

8   had to obviously move to avoid being hit and at that

9   point, he returned two shots.  Those two shots landed in

10  his friend's chest.  At that point chaos ensues and

11  people are scattering, and people are trying to make

12  decisions I guess about what they want or what their

13  expectations are.

14       Mr. Bentley goes to try to assist taking his

15  friend to a vehicle so he can go to the hospital and be

16  cared for.  Mr. Bentley knows what it is like to be shot

17  and certainly to be shot in the chest because when he was

18  16, 17 years old, back in 2019, he was shot multiple

19  times.  And if it had not been for a nearby friend who

20  had managed to find him on the way to the hospital he

21  probably would not have survived his own wounds.  So

22  Mr. Bentley was intent on trying to get his friend help.

23       During that time another individual was there, hid

24  the gun that his friend had used during the course of

25  this event.  Mr. Bentley ends up leaving.  They get the

1  friend in the car, and go.  That is the basis of the

2  criminal threat.  During that time Mr. Bentley is accused

3  of saying, "I'll shoot you, too," in the process of

4  trying to help get his friend into the car.

5       At the conclusion of all of this then they're

6  heading towards the hospital.  Police end up stopping

7  that vehicle.  He is pulled out, they try to do CPR in

8  the middle of the road, and EMS arrives.  He never even

9  makes it to the hospital.  Everyone connected with this

10 absolutely devastated by it.

11      The Government used the term "fled to his aunt's

12 location."  That, again, that's not consistent with what

13 the evidence in that case says happened.  He goes home to

14 his mom's house.  His mom and he go and are going to the

15 hospital to try to see Devin and see if he's okay, the

16 individual who is his friend.

17      While they are out driving on that path he gets a

18 call and he is informed by his friend's brother that he

19 didn't make it; that he died.  So at that point,

20 distraught, under the influence himself, his mom takes

21 him to his aunt's house where they're going to call the

22 police at 8:00 a.m. and let him turn himself in, figure

23 out what's going to happen next.

24      So he is at the aunt's house that morning.  Police

25 then go to both locations.  They go to the aunt's house,

1 and to his mom's house.  We believe the evidence is going

2 to show conclusively that he was under arrest and already

3 in police custody when the police breached his mom's home

4 allegedly to look for him.

5        During the course of that, Your Honor -- may I

6 approach?

7            THE COURT:  Yes.

8        MS. AMYX:  Everything I'm showing the Court

9 today I have already shown the Government.

10        This is a photo from my client's bedroom from the

11 discovery where the police indicate that on the basis of

12 what they find here, they get a search warrant.  The

13 officers say that they located -- affiant observed

14 several cell phones on the floor near the bed, a gun box

15 under the bed, and a large vacuum seal bag which appeared

16 empty on the floor under the bed.

17        It is on the basis of that that they get a warrant

18 to go back into the house, and to support that they say

19 the vacuum bag is used to package illicit drugs, based on

20 the training and experience of the officer.  And that

21 because Mr. Bentley had been arrested in possession of

22 illegal drugs on multiple past occasions, and he has had

23 prior narcotic search warrants served on his residence.

24 There is no date, there is no other information regarding

25 that.

1          You can see from the bed itself, when the officers

2    are given permission to search for Mr. Bentley, they look

3    underneath that bed.  I don't think a human being could

4    fit under there so I think that is beyond the scope of

5    the search.  But even beyond that, Judge, this warrant to

6    go in and search this home is literally based on items

7    that you see in this picture.

8          So, again, this is going to be litigation that

9    we're going to take up in the future but it's important

10   for the Court to know that these are contested facts and

11   that there is going to be ample litigation going forward

12   regarding the issues being raised by this case.

13         So after he is examined under the state statute

14   law and they agree that it is self defense and that he

15   won't be prosecuted for that, they do still charge him

16   for what they perceive to be a criminal threat and

17   criminal possession of a firearm, so then in that case is

18   when he is on -- he's back out on bond and then we turn

19   to the next set of circumstances.

20         Things went well for a brief period of time and

21   then we have the events that took place in January of

22   this year.  In January of this year -- and again, I would

23   ask to approach one more time, Your Honor.

24         THE COURT:  Yep.

25         MS. AMYX:  In January of this year there was an

 1  event which also resulted in the charging of my client

 2  and having a pending case.

 3       With regards to this case, the vehicle that you

 4  see in the picture is my client's vehicle.  He and

 5  another were occupying the vehicle.

 6       That is a special kind of vehicle.  It is a racing

 7  vehicle, Your Honor.  And what we have been able to learn

 8  and gather about the specific vehicle and people who

 9  understand how it operated -- it operates currently, the

10  vehicle tends to backfire.  That means it makes a large

11  banging sound when it gets flooded with gas, for

12  instance.

13       While Mr. Bentley is out in his vehicle with

14  another companion, another car pulls up at a stoplight,

15  there's revving, both cars think the other car wants to

16  race them.  When Mr. Bentley's car backfires, the other

17  vehicle believes they are being shot at, and so a weapon

18  is produced and they start shooting at Mr. Bentley's

19  vehicle.  That's why you see the back windshield

20  shuttered and those bullet holes.  They would have some

21  very close to someone's head and, frankly, we're lucky

22  that this was not another tragic incident.

23       Now not accusing the other people of wrongdoing if

24  they felt like they were being shot at, it makes sense

25  that they would take steps then to try to protect

1  themselves.  But Mr. Bentley and his companion also have

2  the right to protect themselves.  So, again, going

3  forward, we have a very convoluted set of facts that is

4  not being contested, but there is an allegation that

5  Mr. Bentley hurt someone or fired a gun at somebody or

6  injured them or anything of that nature.

7        So --

8            THE COURT:  Well --

9            MS. AMYX:  Go ahead, Judge.

10           THE COURT:  Well, the charges on the bond report

11  involve discharging and use of firearm so --

12           MS. AMYX:  Correct.

13           THE COURT:  -- did Mr. Bentley have a gun that

14  he then responded to this show of force from the other

15  side with?

16       Is that the basis for the charge here or what?

17           MS. AMYX:  Mr. Bentley was driving and did not

18  respond but the passenger of his vehicle did.

19       Now under an aid and abet theory, the Government

20  believes that he is still criminally liable for the

21  criminal discharge of a firearm and that's why I presume

22  that they charged it, as long as the two aggravated

23  assault counts for the two passengers in the other

24  vehicle.

25           THE COURT:  You said there's a racing vehicle

1 but I know it is tagged in Texas.

2        MS. AMYX:  That's correct.  It was tagged in his

3 name, that is how they were able to identify it.  I think

4 him and a family member is what the vehicle was

5 registered to.

6        THE COURT:  Right, but it's not like he's

7 racing --

8        MS. AMYX:  Not unlike a circuit or anything like

9 that.  For purposes of use by the owner it's been I guess

10 upgraded or modified into a truck that that individual

11 would race.  But not like on a circuit, not like NHRA or

12 anything like that.

13        THE COURT:  Okay.

14        MS. AMYX:  Those are the pending cases, Judge.

15 And I know I spent a lot of time on pending cases and I

16 normally wouldn't spend so much time here, but I feel

17 like the bulk of the Government's argument for why my

18 client should remain detained really just has to do with

19 what he has been charged with but is presumed innocent of

20 in the state case.

21        With regards to his family ties, he has extremely

22 strong family ties, as well as lifelong community ties.

23 Additionally, he has family and friends today.  The

24 people you see present here in the courtroom behind me

25 are here in support of him.

1         Based on sort of change of circumstances here we

2    did have additional people at the -- in front of Judge

3    Birzer, but it's just important for the Court to know

4    that my client has both family support and community

5    support.

6              THE COURT:  What about -- tell me this.  The

7    prior conviction, you have been contesting the pending

8    stuff, but since those involve charges like criminal

9    possession of a weapon by a felon, there must be some

10   underlying felonies of which he has been convicted --

11             MS. AMYX:  So that's --

12             THE COURT:  -- that has taken away his legal

13   right to possess a firearm, right?

14        Where is that?  What's the story on that?

15        MS. AMYX:  So let me respond to a couple of

16   things there.

17        The state statute is called felon in possession

18   but it served as a shorthand but it is really criminal

19   possession of a weapon, so it covers a number of things.

20        Under federal law, in order to be a felon to --

21   and to lose your gun rights you have to be convicted of a

22   charge which carries more than year sentence.

23             THE COURT:  So has he ever had that?

24             MS. AMYX:  I'm sorry?

25             THE COURT:  Has he ever had that?

1          MS. AMYX:  He is not a felon under federal law.

2  Under state law based on the -- again, hasn't been

3  challenged since *Bruin*, but there is a state law that

4  says if you get convicted of a felony as a juvenile, then

5  you basically don't get your rights back for eight years

6  after that date.

7          And so the 2020 juvenile case is the 20 JV 36 at

8  the top of page 7 is the case that all of the state

9  charges rely on to start their eight year sort of look

10  back period.

11          And I can show you a charging document if you

12  would like to see the statute from the state and how it's

13  alleged to have been a crime by the state.

14          With regards to that case specifically, Your

15  Honor, it is a distribute certain depressants, criminal

16  possession of a weapon or a firearm is the allegation.

17  That involves seven grams of marijuana.

18          So I know how difficult it is when you see charges

19  like this and sort of go, Well, what is the underlying

20  conduct that was being penalized here?

21          It's not that Mr. Bentley doesn't have some

22  troubling entries from the bond report, Judge.  We freely

23  acknowledge that.  And, in part, that is why we are

24  presenting such strong conditions as part of our release

25  request.

1         As a beginning point, Mr. Bentley would be happy

2    to reside with his mom or his aunt who is present in the

3    courtroom today.

4         Ms. Winters is in the yellow top in the back.

5              THE COURT:  Wait a minute.  Before we move on to

6    that.

7              MS. AMYX:  Yes, sir.

8              THE COURT:  So you directed my attention to the

9    July 2020 conviction on top of Page 7 on the bond report.

10   And as the basis for the state assertion that he can't

11   have a gun in subsequent cases.

12        But I see that the second count in the July of

13   2021 is already criminal possession of a weapon by a

14   felon, so what was the basis for that charge?

15        That would suggest to me that that's looking back

16   at some prior behavior and I see it again in the April

17   2020 conviction.

18             MS. AMYX:  So any --

19             THE COURT:  You tracking me?

20             MS. AMYX:  Yes, I am, Your Honor.

21        So anything that the state says is a felony is a

22   felony.  If the legislature marks it as a felony, it's a

23   felony, regardless of the amount of time.

24             THE COURT:  Right.

25             MS. AMYX:  So there are numerous state felonies

1  where you're only looking at a six month sentence so

2  that's what -- how I interpret this.

3          Now I focussed -- I have only had the case about a

4  week, Judge, so I have focussed on the pending cases.  I

5  will spend more time going through the rest of the report

6  but I don't have his specific knowledge or details about

7  the facts of these, I don't have reports from these.

8          If you give me just a second I will talk to my

9  client and see if I can get the Court some more

10  information regarding that.  At least what the first

11  felony might have been.

12          [Sotto voce discussion had.]

13          MS. AMYX:  Judge, we think that the state felony

14  is when he was 16, top of page 6, that's that 19 JV 456

15  case.

16          THE COURT:  Okay.

17          MS. AMYX:  Regarding to my client's character,

18  Judge, he is a young man and there's no question that

19  there has been some reckless activity in the past.  I

20  know he wishes he had made some different choices in his

21  past but it sometimes takes tragic circumstances to help

22  us mature.

23          Mr. Bentley feels like this is so life changing

24  for him that he is ready to turn the page and, frankly,

25  leave all of this past behind him.  Towards that end, he

1  has asked me to assist him with getting help with his

2  PTSD and his ADHD.

3      Having been shot previously, and certainly having

4  gone through the tragic circumstances that we talked

5  about in September where he took the life of a good

6  friend at gunpoint in actions he was forced to take, I

7  don't know that there is a sort of right way to respond

8  but that he understands he's got to figure out a way to

9  process it and get past what took place.

10      I don't know that he'll sort of ever forgive

11  himself for those circumstances, Judge.  It is not that

12  he is walking in here and pounding his chest and

13  demanding release but under *Salerno*, and under the

14  detention statute, I think my client should be given the

15  benefit of the doubt regarding the pending cases and have

16  an opportunity to bond.

17      Towards that end, Your Honor, we have asked for --

18  certainly he will still have all the conditions of his

19  state cases if he is released.  That would also include

20  electronic monitoring and being on curfew, and we would

21  join in those condition requests on the federal level.

22      We'd ask that he be given an opportunity to live

23  with his aunt just because we think the Court would feel

24  better about the amount of supervising that he would

25  have.  His mom does work full-time and because of his

1  aunt's disability she just, frankly, has a little more

2  time to devote to his needs.

3        He also has his girlfriend present, his long-term

4  girlfriend.  They have been together over four years.

5  She is happy to drive him to appointments, pretrial, to

6  court, wherever he needs to be.

7        With regard to the failure to appear that the

8  Government talked about, I think that is on a traffic

9  case.  That is on Page 7, about the middle, 21 TR 16163.

10       Judge, I think it should be clear from the report,

11 but he was in custody I think on an another case.  So

12 this wasn't a failure to appear where he blew off a court

13 appearance, he was simply in custody.  Other than that he

14 has always appeared.  In fact, his bondsman -- he has

15 used the same bondsman throughout, he has never had a

16 problem reaching him, always comes to court, so there is

17 no issue here about his not coming to court.

18       I think the factors that the Court has to

19 determine under the statute is safety of the community or

20 any individual person, and with regards to that, Your

21 Honor, I don't think that there is any -- there is no

22 specific risk to a specific person.

23       The Government's fears, even if they were

24 well-founded, is a speculative risk to the entirety of a

25 community but not to one specific person or location or

1  place.

2         THE COURT:  Well, let me be clear.  Under Tenth

3  Circuit law the danger to the community is simply the

4  risk that he commits additional crimes to the detriment

5  of his community.  That is how they described it in

6  *United States versus Cook* in a few cases since then, so

7  that's the real question.

8         Is he going to hurt -- is he a danger to some

9  specific person, or is he a danger that he's just going

10 to go out and keep committing crimes?  And I think from

11 what I have heard today, and based on what I saw from

12 Judge Birzer's prior hearing, no one really thinks he is

13 likely a flight risk, and the danger focus is really that

14 of additional criminal conduct.

15        So while we're talking about this, let me just

16 pose this question:

17        With respect to that inquiry, how much of that

18 is -- the risk of danger to the community, the

19 conditional criminal conduct, how closely is that tied to

20 the charged offense versus just his history in general?

21 Because he -- the charged offense, as you've observed, is

22 a -- a paperwork offense in its truest -- when you

23 distill it down into what it is.  It is the possession of

24 a fire item that the Government says you can't possess

25 unless you tell us about it and give us some money.

1        But I hear your description of how so much of this

2   is the devil is in the details of all these additional

3   charges he's facing, and there are circumstances in each

4   one of them that you think diminish his criminal

5   culpability, or extinguish it:  Wrong place, wrong time,

6   whatever but he has -- he does have other convictions and

7   even while during the pendency of some of these cases he

8   hasn't managed to keep himself out of trouble in an

9   exemplary fashion, to put it mildly.

10        So when I am assessing the risk that he will go

11  out and engage in additional crime to the detriment of

12  the community, is that in anyway linked or circumscribed

13  by the charges in this case, or is that a free flowing

14  inquiry, limited only by his criminal history?

15        MS. AMYX:  It's an excellent question, Judge,

16  and I don't know that I have read any case law anywhere

17  that distinction being made.

18        We obviously would request that the Court sort of

19  limit the scope of that to tying it to the nature of the

20  charges for the same reason that -- where I started this

21  hearing.  I don't think that federal court should sort of

22  be the place that we go to to get results if we don't

23  like what happens at the state level.

24        So limiting the Court to a federal case, what is

25  charged here, the risk that is presented by this

1  individual regarding this crime to the community,

2  respectfully, Your Honor, I don't think that there is any

3  risk to the community based on this particular crime.

4  The risk is speculative based on pending cases and past

5  criminal history.

6          THE COURT:  Okay.

7          MS. AMYX:  Thank you, Your Honor.  I appreciate

8  the Court's careful and thoughtful analysis regarding

9  this case.

10         THE COURT:  What is the -- I thought you were

11 going to give me some detailed discussion of the release

12 plan and how it was going to make sure he stays out of

13 trouble.

14         Now I hear you want to place him with his aunt,

15 but what is it beyond that?

16         MS. AMYX:  So he would be living at his aunt's

17 residence.  He would be on a curfew, so he is either at

18 home or at work, so in essence, it's very close to house

19 arrest.

20         They typically get about two hours per week to run

21 errands like groceries, sometimes people are allowed to

22 go to church, and we would ask for that in this case

23 because the family is a family of faith, but beyond that

24 he is either at home or at work.  He is on an electronic

25 monitoring bracelet the entire time, so there is no

1  question about where his location is, so we would ask for

2  just a straight no driving provision.

3          At this time, although he has worked diligently to

4  try to get his license back when he was out of custody,

5  he was working, he had saved about $5,000 so he could

6  hire a lawyer for his state case. Mr. Schoenhofer is

7  simply waiting to be paid so that he can take over that

8  representation. But during the time period when he was

9  out he had been working, really loved his job, but he had

10 been arrested at the job so he is hoping to get that job

11 back.

12          If not, we do have some other possibilities but

13 certainly he would gain employment within two weeks and

14 beyond working and being at home, except for the two-hour

15 option every week to sort of go out and run errands,

16 that's it for freedom for him. So he is locked down at

17 night, he's not allowed to drive, and it's work or home.

18 And his aunt runs a very tight ship, Your Honor. So he

19 is not going to have friends or substances or anything

20 like that in her house when he is there.

21          She certainly understands the seriousness of what

22 is taking place. She has been working very hard with him

23 as far as getting his driver's license back and taking

24 some of these steps forward.

25          I also think one of the things we ask for, and I

1  am remiss in not thanking Mr. Kirk.

2      Because I am new to this case I had to try to work

3  over the weekend to get information to them and both he,

4  Mr. Kirk, and the Government were gracious in accepting

5  that information and doing additional work for us. But

6  in regard to that, we also asked for the opportunity for

7  him to get set up with Clinical Associates, that is the

8  therapy group that probation uses. He would like to try

9  to go on medication, and also to seek therapy.

10      So I think that having his time both focussed and

11  limited for what's available, I mean he is sleeping at

12  his aunt's house, he's working and going to therapy, and

13  that is the extent of his freedom if you release him on

14  this case while we go through what is obviously going to

15  be extensive litigation.

16      Does that -- did I do a good enough job answering

17  the Court's question?

18          THE COURT:  I think so.

19      And what happens when the state case -- if he were

20  to bond out here, are they looking for him over there?

21          MS. AMYX:  No, because he hasn't violated his

22  bond on this case.

23      Bearing in mind that he was released in February

24  from custody, although this case was charged federally in

25  March, it pre-existed from September, so there is no new

1 violation of bond, so he will remain on bond in the state

2 cases and under those state conditions.  So he'll have a

3 bondsman and a pretrial officer.

4           THE COURT:  Okay.

5           MS. AMYX:  Thank you, Your Honor.

6           THE COURT:  Thank you.

7      Mr. Treaster, a lot of information came out during

8 the defendant's presentation.  Do you have anything you

9 want to say about that?

10          MR. TREASTER:  About any of the other

11 information?

12      Your Honor, I didn't focus on the details, I

13 didn't get the reports of the cases that he is charged

14 with, so I don't have any more details.  No, I don't -- I

15 don't really have anything.

16      I just am very concerned about the safety of the

17 community, Your Honor.  And I'm very concerned about

18 his -- he just has a pattern of behavior of being around

19 firearms and doing stupid stuff.

20      I mean even with what Ms. Amyx said, you know,

21 he's using substances which I assume is you know, at the

22 very least, marijuana and he's got a gun in his

23 possession, and he ends up shooting somebody.  So I just

24 I'm very concerned.  I wouldn't be here pushing so hard

25 if I wasn't, Your Honor.

1          I am worried about the safety of the community.  I

2  am worried about the Court's probation officers.  I just

3  think it's an unnecessary risk we're taking here to let

4  this go guy back out.

5          Thank you.

6          THE COURT:  All right.  Take this matter under

7  advisement, get you a written decision and short order.

8          In the meantime, he'll remain detained pending the

9  issuance of my decision.

10         Anything else?

11         MR. TREASTER:  No, Your Honor.  Thank you.

12         MS. AMYX:  No, Your Honor, thank you.

13         THE COURT:  Court's in recess.

14         (Proceedings conclude at 10:05 a.m.)

15         **********************************************

16                     C E R T I F I C A T E

17         I, Jana L. McKinney, United States Court

18  Reporter in and for the District of Kansas, do hereby

19  certify:

20         That the above and foregoing proceedings were

21  taken by me at said time and place in stenotype;

22         That thereafter said proceedings were

23  transcribed under my discretion and supervision by means

24  of transcription, and that the above and foregoing

25  constitutes a full, true and correct transcript of

1  requested proceedings;

2         That I am a disinterested person to the said

3  action.

4         IN WITNESS WHEREOF, I hereto set my hand on

5  this, the 2nd day of May, 2023.

6              s/ Jana L. McKinney
              Jana L. McKinney, RPR, CRR, CRC, RMR
7              United States Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

<u>PAGE</u>

REPORTER'S CERTIFICATE                                    42